IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
UNITED STATES OF AMERICA      )
                              )     CRIMINAL ACTION NO.
     v.                       )        3:13cr288-MHT
                              )            (WO)
DELFINO PEREZ-GOMEZ           )
```

## OPINION

Defendant Delfino Perez-Gomez moved to dismiss the
one-count indictment against him for unlawful reentry
of a removed alien, 8 U.S.C. § 1326(a)(1), on the
ground that his original removal proceeding was
fundamentally unfair and deprived him of the right to
judicial review. The magistrate judge entered a
recommendation that the dismissal motion be denied, and
Perez-Gomez objected to that recommendation. After an
independent and de novo review of the record, the court
entered an order last week, on November 21, 2014,
overruling Perez-Gomez's objection, adopting the
magistrate judge's recommendation, and denying

Perez-Gomez's dismissal motion.   This opinion explains
the basis for that order.

## I. FACTUAL BACKGROUND

Perez-Gomez is a native and citizen of Guatemala,
and he is not a citizen of the United States.   He first
entered this country without authorization or
inspection in December 2006.   In January 2012, he was
arrested in Lee County, Alabama for failing to pay
several traffic tickets.   At the county jail, he
encountered federal immigration officials who
discovered that he had entered the country without
inspection, and they took him to an immigration
detention facility.

A few days later, Perez-Gomez received a hearing
before an immigration judge.   The hearing was conducted
by video teleconference.   The immigration judge began
by addressing a group of detained aliens.   The judge
determined that all of the aliens spoke either English
or Spanish.   He went on to discuss the nature of the

hearing and of the aliens' procedural rights in the hearing.   With regard to immigration relief, the immigration judge said:

> "[I]f the court finds that you are subject to removal we will determine whether or not you are eligible for any sort of relief. That relief that might allow you to remain in the United States.  If any such relief is available, we will discuss it and I will give you an opportunity to apply for it."

Transcript of Imm. Hearing, Def.'s Ex. 5 (Doc. No. 47-1) at 2 (repetitions by Spanish interpreter omitted).  With regard to the aliens' right to appeal, the immigration judge said:

> "At the end of the case I will make a decision.  You have a right to accept my decision or if you disagree with my decision you can appeal it to a higher court of law called the Board of Immigration of Appeals.  If you accept my decision and the government attorney accepts it, the decision becomes final and the case will be over.  Accepting my decision also means you do not wish to appeal.  If you do wish to appeal, I will tell you how to do that.  I'll give you the forms, tell you where they should be sent, and etc.  You have also been given a document that explains your

3

> appeal rights.  Those are your rights
> in this deportation hearing."

**Id**. at 3.[1]

Before he reached Perez-Gomez, the immigration judge engaged into a colloquy with another of the detainees, as follows:

> "Respondent/Interpreter: Uh, yes, I
> have a question ... that about having
> money, what is that for?
>
> "Judge: That would be for voluntary
> departure. But that's the first thing
> you need, you need to have the money
> to pay your ticket back to Mexico. And
> you told me you didn't have it. Okay?"

**Id**. at 18.

Some time later, the immigration judge addressed Perez-Gomez individually.  The judge first engaged in a

---

1. Perez-Gomez denies that he received the appeals-rights document.  However, there is affidavit testimony from an ICE agent that the agency provided him with the document describing his appellate rights when he was processed. Gov. Ex. 5 (Doc. No. 57-2) at 1. Since, as described below, Perez-Gomez's waiver of administrative and judicial review was not deficient regardless of his knowledge of appeal rights and procedures, the court need not make a finding about whether he actually received the document, during processing or during the hearing.

colloquy about Perez-Gomez's understanding of his rights:

> "Judge: You were present when I explained your rights?
>
> "[Perez-Gomez]: Yes.
>
> "Judge: Do you understand your rights?
>
> "[Perez-Gomez]: Yes.
>
> "Judge: Would you like time to find an attorney?
>
> "[Perez-Gomez]: No."

Id. at 25. The judge determined that Perez-Gomez was removable after he admitted that he was not a citizen or national of the United States and had come to the United States "without papers." Id. at 25-26.

The immigration judge next asked Perez-Gomez four questions, presumably to determine whether he was eligible for any form of relief: "Do you have fear of returning to Guatemala?"; "Do you have family in the United States?"; "Has anyone ever filed papers for you to get legal residence in the United States?"; and "Do you have the money immediately available to depart the

United States?"    Perez-Gomez answered "No" to each question.   Id. at 27-28.   At that point, the judge stated: "So the court finds that the government has a right to deport you because you're in the United States illegally.   So I must order that you be removed from the United States to Guatemala.   You accept that decision?"   Id. at 27.    Perez-Gomez responded affirmatively.

Perez-Gomez was removed from the United States 15 days later.   He subsequently reentered the country, was apprehended by Alabama state troopers for driving under the influence, and was transferred to federal custody. The United States brought the pending criminal prosecution against him for reentering the United States after being removed.

## II. DISCUSSION

Federal immigration law makes it a crime for an alien to be found in the United States after he "has been ... deported, or removed or has departed the

United States while an order of exclusion, deportation, or removal is outstanding," unless he receives advance permission from the Attorney General.    8 U.S.C. § 1326(a)(1).    Perez-Gomez argues that, in light of certain procedural defects in his 2012 removal hearing, it would violate his due-process rights for this previous order of removal to satisfy the removal element of the crime.  Specifically, Perez-Gomez argues that the hearing was flawed because he was misled into believing that he was ineligible for two forms of relief: voluntary departure prior to completion of removal proceedings and voluntary departure at the conclusion of removal proceedings.  If he had received either form of relief, he would not have been guilty of the crime of illegal reentry.

As discussed below, the court finds that in this case, the failure to notify Perez-Gomez of his eligibility for the two forms of voluntary departure did not render the underlying removal proceeding overall fundamentally unfair and thus did not violate

7

his Fifth Amendment due-process rights.   However, the court will address all factors should there be an appeal.


## A. Vehicle for Relief

Based upon this court's reading of applicable case law, a motion to dismiss does not appear to be the proper vehicle to raise the issue before the court: whether the prior removal proceedings can be relied upon as the basis for the present felony charge. Rather, although Perez-Gomez filed this as a motion to dismiss, the motion should be construed as a motion in limine.

Admittedly, other district courts have granted defense motions to dismiss illegal reentry prosecutions where the motions challenged the deportation element of the offense under 8 U.S.C. § 1326(d).   See, e.g., United States v. Copeland, 228 F. Supp. 2d 267, 272 (E.D.N.Y. 2002), vacated on other grounds, 376 F.3d 61 (2d Cir. 2004); United States v. Aguirre-Tello, 181 F.

Supp. 2d 1298, 1307 (D.N.M. 2002), <u>reversed on other</u> <u>grounds</u>, 353 F.3d 1199 (10th Cir. 2004).  Indeed, the Supreme Court itself affirmed a court order granting a defense motion to dismiss <u>United States v.</u> <u>Mendoza-Lopez</u>, 481 U.S. 828, 842 (1987).

Nevertheless, a motion to dismiss the indictment is not the appropriate vehicle for mounting a collateral attack on a deportation under § 1326(d).  As a threshold matter, the holdings of other district courts have no precedential weight in this jurisdiction and are therefore persuasive authority only.  And, even as persuasive authority, none of them addresses this issue.  Second, and more importantly, this aspect of the <u>Mendoza-Lopez</u> decision is distinguishable.  The Supreme Court did not determine the proper vehicle for raising a challenge to a deportation used as an element in an illegal reentry prosecution; instead, the Court focused on the constitutionality of prosecution for illegal reentry when the defendant's due-process rights had been violated in the deportation proceeding.  At

9

the trial-court level, the defendants, Jose Mendoza-Lopez and Angel Landeros-Quinones, had moved to suppress the evidence of their deportation, and the district court granted the motion and dismissed the case. See United States v. Mendoza-Lopez, 781 F. 2d 111, 112 (8th Cir. 1985), aff'd, 481 U.S. 828 (1987). It is unclear when, procedurally, this dismissal occurred. The Eighth Circuit Court of Appeals affirmed the dismissal, but it did not discuss the propriety of the procedure used in the court below.

Regardless of how the Eighth Circuit handled the question, case law from the Eleventh Circuit Court of Appeals is clear: a motion challenging the sufficiency of an indictment must be analyzed without looking to the sufficiency of the evidence. The appellate court has stated: "The sufficiency of a criminal indictment is determined from its face. The indictment is sufficient if it charges in the language of the statute." United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992). Once a defendant is properly

indicted, "the government is entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." <u>United States v. Salman</u>, 378 F.3d 1266, 1268 (11th Cir. 2004).  This is because the rules do not "provide for a pre-trial determination of the sufficiency of the evidence." <u>Critzer</u>, 951 F.2d at 307.

Here, the indictment is sufficient.  The indictment asserts that Perez-Gomez "did, being an alien, knowingly re-enter, and was found in, the United States after having been deported, without obtaining the permission of the Secretary of Homeland Security or the Attorney General of the United States ...."  By way of comparison, the language of the statute states, "any alien who ... has been ... deported ... and thereafter enters ... the United States, unless prior to his reembarkation at a place outside the United States of his application for admission from foreign contiguous territory, the Attorney General has expressly consented

**11**

to such alien's reapplying for admission ...." 8
U.S.C. § 1326(a). The language of the indictment thus
clearly tracks the language of the statute, meaning
that a motion to dismiss is not the proper vehicle for
Perez-Gomez's challenge.

Instead, the court construed Perez-Gomez's motion
to dismiss as a pretrial evidentiary motion to exclude
evidence of his prior deportation, i.e., as a motion in
limine.[2] Regardless, however, of how it is construed,
the court reaches the same conclusion.

---

2. This is as opposed to a motion to suppress.
Black's Law Dictionary defines a motion in limine as a
"pretrial request that certain inadmissible evidence
not be referred to or offered at trial." Black's Law
Dictionary (9th ed. 2009). Black's defines a motion to
suppress as a "request that the court prohibit the
introduction of illegally obtained evidence at a
criminal trial." Id. Here, it would not be accurate
to say that the evidence was illegally obtained, in the
sense of a violation of the Searches and Seizures
Clause of the Fourth Amendment. Cf. United States v.
Wilk, 572 F.3d 1229, 1236 (11th Cir. 2009) (treating a
"motion to suppress" as "a motion in limine to exclude
[evidence] as privileged under Federal Rule of Evidence
501" "[b]ecause Wilk did not address this issue in a
Fourth Amendment context ...").

## B. Voluntary Departure

The Immigration and Nationality Act allows for a form of relief called 'voluntary departure,' either prior to the completion of proceedings (and sometimes in lieu of any proceedings), <u>see</u> 8 U.S.C. § 1229c(a), or at the completion of proceedings, <u>see</u> 8 U.S.C. § 1229c(b). Perez-Gomez was clearly eligible for pre-completion voluntary departure. He may also have been eligible for post-completion voluntary departure.

Voluntary departure can be a beneficial "quid pro quo" for both the government and an alien subject to deportation. <u>Dada v. Mukasey</u>, 554 U.S. 1, 11 (2008). The Supreme Court has explained:

> "From the Government's standpoint, the alien's agreement to leave voluntarily expedites the departure process and avoids the expense of deportation--including procuring necessary documents and detaining the alien pending deportation. The Government also eliminates some of the costs and burdens associated with litigation over the departure .... Benefits to the alien from voluntary departure are evident as well. He or she avoids extended detention pending completion of travel arrangements; is

13

> allowed to choose when to depart
> (subject to certain constraints); and
> can select the country of destination.
> And, of great importance, by departing
> voluntarily the alien facilitates the
> possibility of readmission."

Id. Voluntary departure facilitates readmission because it allows an alien to avoid some of the penalties attendant to deportation. Alvarado v. U.S. Atty. Gen., 610 F.3d 1311, 1316 (11th Cir. 2010). An alien who has voluntarily departed may be eligible for readmission immediately if they have been here for only a short period of time, or within 3 years if they have been here for less than a year. See 8 U.S.C. § 1182(a)(9)(B)(i). By contrast, an alien who has been deported will not be eligible for readmission for at least five years and, depending on circumstances, may not be eligible for readmission for ten years, 20 years, or life. 8 U.S.C. § 1182(a)(9)(A). One of the penalties that voluntary departure allows an alien to avoid is a deportation order that could serve as an element of a § 1326 reentry offense.

Before Perez-Gomez's hearing, the Board of Immigration Appeals had held that immigration judges are required to notify aliens of their eligibility for voluntary departure.  See In re Cordova, 22 I&N Dec. 966, 971 (BIA 1999) (en banc) ("In order to accord full due process to all aliens who may be eligible for voluntary departure under section 240B(a) of the Act [8 U.S.C. § 1229c(a)], the Immigration Judge must notify all aliens who are apparently eligible of the availability of voluntary departure under [§ 1229c(a)]."). An immigration judge's discretionary denial of voluntary departure is appealable to the Board of Immigration Appeals.  See 8 C.F.R. § 1003.1(b)(3). When an immigration judge does not notify an alien who is apparently eligible for voluntary departure of his eligibility, it is appropriate to remand the case to the immigration judge so a determination can be made. Cordova, 22 I & N Dec. at 972.

In order to be eligible for pre-completion departure, an alien must:

> "(A) Make[] such request prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing;
>
> "(B) Make[] no additional requests for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);
>
> "(C) Concede[] removability;
>
> "(D) Waive[] appeal of all issues; and
>
> "(E) Ha[ve] not been convicted of a crime described in section 101(a)(43) of the Act [aggravated felony] and is not deportable under section 237(a)(4) [national security]."

8 C.F.R. § 1240.26(b)(1)(i). Contrary to what the immigration judge said to Perez-Gomez, having the immediate means to fund one's own departure is not a prerequisite for consideration for pre-completion voluntary departure, although the alien is required to leave within 120 days after the grant of voluntary departure, <u>see</u> 8 U.S.C. § 1229c(a)(2)(A), and the

immigration judge may require the alien to leave more quickly, see 8 C.F.R. § 1240.26(e).[3]

------

3. The immigration judge's colloquy on this point ("Do you have the money immediately available to depart the United States?" "No.") may derive from an older regulation governing eligibility for voluntary departure in which having "immediate means" was a prerequisite to obtaining voluntary departure. See 8 C.F.R. § 244.1 (1996) ("[I]f the alien establishes that he/she is willing and has the immediate means with which to depart promptly from the United States, an immigration judge may authorize the alien to depart voluntarily from the United States in lieu of deportation within such time as may be specified by the immigration judge when first authorizing voluntary departure...."); see also Matter of Thomas, 21 I. & N. Dec. 20 (BIA 1995) (citing this requirement).

The statute and regulations governing voluntary departure were overhauled with the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, div. C, 110 Stat. 3009-546 (IIRIRA), creating the bifurcated pre- and post-completion voluntary departure procedure that was available to Perez-Gomez. See IIRIRA 308(b)(7), 110 Stat. 3009-615 (1996) (repealing INA § 244(e), 8 U.S.C. 1254(e)); IIRIRA 304(a)(3), 110 Stat. 3009-596 (1996) (codifying INA § 240B, 8 U.S.C. § 1229c).

The current pre-completion voluntary departure regulations do not contain an "immediate means" provision. Instead, as discussed above and below, the statutory cap provides for a departure period of 120 days for aliens granted relief prior to the completion of proceedings. Establishing that the alien has the means to depart at all is now a regulatory prerequisite (continued...)

Perez-Gomez was eligible for this form of voluntary departure regardless of his immediate ability to pay to leave the country.  He had not committed an aggravated felony and was not deportable for national-security reasons.  He was willing to concede removability and waive appeal and made no other requests for relief. The video-conferenced hearing was his first contact with an immigration judge.

The prerequisites for post-hearing voluntary departure are:

> "(i) The alien has been physically present in the United States for period of at least one year preceding the date the Notice to Appear was

only for post-completion voluntary departure.  8 C.F.R. § 1240.26(c)(1).     When  post-completion  voluntary departure is granted, a bond must be posted within 5 business days of the immigration judge's order granting voluntary departure.  8 C.F.R. § 1240.26(c)(3)(i).

The  court  finds  it  disconcerting  that  this particular  immigration  judge  misrepresented  the eligibility requirements for voluntary departure so long  after  the  regulation  had  changed.   This immigration judge's misunderstanding of the law, and his affirmative misstatements to that effect, may have likewise  prejudiced  the  deportation  proceedings  of thousands of aliens.

served under section 239(a) of the Act;

(ii) The alien is, and has been, a person of good moral character for at least five years immediately preceding the application;

(iii) The alien has not been convicted of a crime described in section 101(a)(43) of the Act [aggravated felony] and is not deportable under section 237(a)(4) [national security]); and

(iv) The alien has established by clear and convincing evidence that the alien has the means to depart the United States and has the intention to do so."

8 C.F.R. § 1240.26(c)(1).   The government has a stronger argument that Perez-Gomez did not satisfy the prerequisites for this form of voluntary departure, based on his statement that he did not have funds immediately available to leave the country.   However, the court need not reach that issue, because Perez-Gomez was undoubtedly eligible for pre-completion voluntary departure.

C. History of **Mendoza-Lopez** and § 1326(d)

Subsection (d) of 8 U.S.C. § 1326 sets out three prerequisites for an alien to attack collaterally his removal order during a criminal prosecution for illegal reentry:

> "In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) of this section... unless the alien demonstrates that—
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair."

8 U.S.C. § 1326(d). In order to understand accurately this subsection, it is necessary to understand the history behind its addition to the statute.

When Congress passed § 1326, there was no explicit provision for an alien to attack collaterally an

20

underlying deportation order, although earlier statutes had contained such provisions.   See Mendoza-Lopez, 481 U.S. at 835.   Nonetheless, some courts of appeals read an implied right of collateral attack, holding that a deportation could be an element of the illegal-reentry crime only if it was "lawful"; other appellate courts read the text of the statute strictly and refused to consider such collateral attacks.   See id. at 833 n.6, 834 n.9 (collecting cases).   In order to resolve the dispute among the courts of appeals, the Supreme Court took up the case of Jose Mendoza-Lopez and Angel Landeros-Quinones.

Mendoza-Lopez and Landeros-Quinones were Mexican nationals who were in the United States without authorization.   They were arrested by agents of the Immigration and Naturalization Service in Nebraska and transported to a detention center where an immigration judge conducted a group deportation hearing for which neither man had counsel.   Both men met the prerequisites to be eligible for a form of

discretionary immigration relief called 'suspension of deportation,' and this form of relief was discussed in the group deportation hearing.   However, as later found by the district court:

> "[T]he Immigration Judge did not answer a question from one of the respondents regarding application for suspension of deportation; ... the Immigration Judge addressed the wrong respondent while discussing eligibility for the remedy; ... the Immigration Judge did not make clear how much time he would allow respondents to apply for suspension; and... Landeros-Quinones asked a question which demonstrated that he did not understand the concept of suspension of deportation, but... the Immigration Judge failed to explain further."

<u>Id</u>. at 831 n.4.   The two men declined to pursue suspension of deportation and each waived his right to appeal.   They were deported and were later arrested in Nebraska again.   After this second arrest, the two men were criminally prosecuted for illegal reentry.

Reviewing the case, the Supreme Court first rejected the argument that there was an implicit collateral-attack provision in the former § 1326.   <u>See</u>

id. at 837.  Nonetheless, the Court held that Fifth Amendment due process requires that collateral attacks be available in certain situations: "Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding."  Id. at 837-38.  Therefore, the Court continued, "at the very least ... where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense."  Id. at 838.

The Court held that procedural defects at the two men's hearing had deprived them of judicial review. "The Immigration Judge permitted waivers of the right to appeal that were not the result of considered judgments by respondents."  Id. at 840.  There had not

23

been considered judgment on the part of the defendants
because the immigration judge "failed to advise
respondents properly of their eligibility to apply for
suspension of deportation." Id. "Because the waivers
of their rights to appeal were not considered or
intelligent," the Court held that the defendants "were
deprived of judicial review of their deportation
proceeding." Id.[4] Therefore, the previous deportations
could not be used to support the criminal prosecution
for illegal reentry.

However, because the government had stipulated that
the two men's hearing had been "fundamentally unfair,"
the Court did not reach the question of which
procedural defects render a removal order unfit to
satisfy an element of illegal reentry. Id. at 839-40;

---

4. The Court also explicitly distinguished between
immigration-court proceedings and state-court
proceedings. While a federal court should not look
behind a state-court conviction that constitutes an
element of a federal crime, administrative
determinations do not merit the same respect absent an
opportunity for judicial review. See Mendoza-Lopez,
481 U.S. at 840-42.

n.17.    However, after noting that the challenge there was  collateral, as  opposed  to  direct,  the  Court, drawing  on  a  comparison  with  what  it  considered "analogous  abuses"  in  the  criminal  proceedings. emphasized  the  limited  application  of  the  phrase "fundamental"  error,"  id.  at  839,  n.17:  "We  have previously  recognized...  in  the  context  of  criminal proceedings,  that  some  errors  necessarily  render  a trial  fundamentally  unfair,  Rose v. Clark,  478  U.S. 570,    577    (1986)    (use    of    coerced    confession, adjudication by biased judge);  see also  Rose v. Lundy, 455  U.S.  509,  543-544  (1982)  (Stevens,  J.,  dissenting) (mob  violence,  knowing  use  of  perjured  testimony). While  the  procedures  required  in  an  administrative proceeding  are  less  stringent  than  those  demanded  in  a criminal  trial,  analogous  abuses  could  operate,  under some  circumstances,  to  deny  effective  judicial  review of  administrative  determinations  (internal  quotation marks  omitted)."  Id.   In  short,  that  there  was  error does not mean that that error was fundamental.

At its most narrow, the Mendoza-Lopez Court held that, where judicial review has been foreclosed through a waiver that was not knowing and intelligent, a removal order entered through a fundamentally unfair proceeding cannot satisfy an element of a subsequent criminal conviction. Specifically, it held that a waiver is not knowing and intelligent when it is made by an alien who is removable but eligible for some form of discretionary relief, if the alien is unaware of or confused about his eligibility for such relief. Mendoza-Lopez and Landeros-Quinones appeared without counsel, and, based on the immigration court's colloquy, they had no reason to believe that they were eligible for any relief from deportation. Therefore, in their minds, there would have been no argument to raise on appeal, even if an appellate panel were sympathetic. Mendoza-Lopez held that an appeal waiver grounded in such a misunderstanding, if it renders the proceedings fundamentally unfair, is not valid.

Before Congress enacted the current statutory framework for collateral challenges to removal orders during illegal-reentry proceedings, courts adjudicated such collateral attacks based on the constitutionally required Mendoza-Lopez framework.  In 1996, in the Antiterrorism and Effective Death Penalty Act, Congress added the text of 8 U.S.C. § 1326(d) to codify the holding of Mendoza-Lopez.  See United States v. Lopez, 445 F.3d 90, 94 (2nd. Cir. 2006) (explaining that "this provision [8 U.S.C. § 1326(d)] effectively codified the Supreme Court's decision in United States v. Mendoza Lopez"); United States v. Wilson, 316 F.3d 506, 514 n.1 (4th Cir. 2003) (Motz, J., concurring in the judgment); see also  140 Cong. Rec. S 14544 (daily ed. Oct. 6, 1994) (statement of Sen. Smith) (the language of § 1326(d), as included in a previous version of the bill, "is taken directly from the U.S. Supreme Court case of United States v. Mendoza-Lopez"); 139 Cong. Rec. E750 (Extensions of Remarks March 24, 1993) (statement of Rep. Bill McCollum) (same).

27

In sum, 8 U.S.C. § 1326(d) must allow for a defendant similarly situated to Mendoza-Lopez to attack collaterally his removal order for two reasons: first, because Congress's intent in enacting the provision was to codify Mendoza-Lopez; and, second, because the alternative would violate the Constitution.  With this in mind, this court will now apply the § 1326(d) requirements to Perez-Gomez's case.

### D. Applying the § 1326(d) Requirements

#### 1. Administrative Exhaustion

The first requirement for a collateral attack under 8 U.S.C. § 1326(d) is that "the alien exhausted any administrative remedies that may have been available to seek relief against the order."  8 U.S.C. § 1326(d)(1). There are two possible interpretations of this statute, but, under Mendoza-Lopez, only one passes constitutional muster.  An impermissible reading of this provision would require an alien to exhaust even those administrative remedies that are not functionally

available to him—-that is, even if he had been told by
an immigration judge that no such remedy existed.
Instead, the due-process holding of Mendoza-Lopez
requires that, before collaterally challenging an
underlying deportation order in a reentry case, an
alien must exhaust only those remedies that are
effectively available.

Noting that Perez-Gomez had been instructed
generally as to the availability of an
administrative-appeal process and that he had not
pursued such an appeal, the magistrate judge found that
this first prerequisite was not satisfied and that
Perez-Gomez's collateral attack must fail.  To reach
this conclusion, the magistrate judge relied on two
Eleventh Circuit Court of Appeals cases.  Neither case
dictates strict adherence to the
administrative-exhaustion requirement in a case such as
this one.

In Sundar v. I.N.S., 328 F.3d 1320, 1323 (11th Cir.
2003), the Eleventh Circuit discussed the

administrative-exhaustion requirement for removal orders on direct review pursuant to 8 U.S.C. § 1252(d)(1).  In the direct review context, the court noted, exhaustion promotes "respect for administrative agencies" and allows the Board of Immigration Appeals to "discover and correct their own errors." Id. (internal citations omitted).  The Eleventh Circuit then reasoned that the requirement applies with equal force for petitioners seeking habeas review of a final removal order in 28 U.S.C. § 2241 proceedings, because, as it explained, the interests of protecting agency authority and promoting judicial efficiency are the same in both contexts.  Without an exhaustion rule, "unnecessary petitions" might "undermine agency functions and clog the courts." Id.

Following Sundar, the Eleventh Circuit, in an unpublished opinion, held that the exhaustion requirement also applies when an immigration judge erroneously informs an alien that he is not eligible for discretionary relief.  United States v. Valentin

30

Morales, 131 Fed. Appx. 159, 160-61 (11th Cir. 2005).
To reach this conclusion, the court of appeals
summarily adopted the reasoning of Sundar--requiring
exhaustion prior to bringing a habeas-corpus
challenge--for the reentry collateral-challenge
context, without reconciling key differences between
these two types of challenges.   This court finds that
this opinion, which is not binding, is unpersuasive[5] and
inapposite[6] here, and that Sundar is distinguishable.

_____

5. "Unpublished opinions are not considered binding
precedent, but they may be cited as persuasive
authority," 11th Cir. R. 36-2; United States v.
Futrell, 209 F.3d 1286 (11th Cir. 2000).

6. In support of its application of a strict
administrative-exhaustion requirement in this context,
the Eleventh Circuit explained that an alien who had
not exhausted administrative remedies prior to
deportation could still seek rescission of the
deportation order after removal.   Valentin Morales, 131
Fed. Appx. at 160-61.

However, under current immigration regulations,
Perez-Gomez could not file a motion to reopen or
reconsider his removal order once he was removed from
the country, and filing a motion to reopen or
reconsider would not stay his removal. 8 C.F.R.
§ 1003.23(b)(1) (Reopening or reconsideration before
the Immigration Court: "A motion to reopen or to
(continued...)

First, and most importantly, the requirements of due process are different in the context of a collateral attack during a prosecution under § 1326 from those in other contexts; this difference is at the center of this dispute. Congress is authorized to regulate access to the courts generally, <u>see Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction"), and the requirement that a habeas petitioner exhaust state remedies before seeking federal remedies predates the statutory structure for habeas corpus.  <u>See Felker v. Turpin</u>, 518 U.S. 651, 662

---

reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States."); 8 C.F.R. § 1003.2(d) (same for BIA appeals); 8 C.F.R. § 1003.23(b)(1)(v) ("Except in cases involving abstentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case."); <u>but see Jian Le Lin v. U.S. Attorney Gen.</u>, 681 F.3d 1236 (11th Cir. 2012) (holding that the immigration regulation denying the right to file a motion to reopen before the Board of Immigration Appeals after departure impermissibly conflicts the with statutory right to file one motion to reopen).

n.4 (1996) (discussing the history of the exhaustion requirement).   In contrast, the Mendoza-Lopez court held that due process required the ability to collaterally attack the result of an administrative proceeding used as a predicate in a criminal prosecution, in a case in which the defendant had been precluded from exhausting his administrative remedies. For this reason, Valentin Morales is fatally flawed. The strict administrative-exhaustion requirement articulated in Valentin Morales would have barred Mendoza-Lopez's collateral attack for the same reason it barred Valentin Morales's, and for the same reason that the government argues it should bar Perez-Gomez's. The Valentin Morales court did not attempt to reconcile its decision with Mendoza-Lopez; its silence is unpersuasive.

Second, and relatedly, the scope of collateral review in this context is significantly narrower from what would be available under habeas corpus.   Habeas review attacks the deportation order itself, and a

33

successful petition could have the effect of vacating a constitutionally defective order.  Yet the due-process right recognized in <u>Mendoza-Lopez</u> and codified in § 1326(d) concerns only whether a removal order is sufficient to constitute an element of a subsequent criminal offense.  The collateral attack does not alter the effect of the removal order in other arenas, such as if Perez-Gomez sought permission to enter the United States lawfully.

Next, the judicial values of protecting agency authority and promoting judicial efficiency do not operate in a § 1326(d) collateral attack in the same way as in direct review and habeas proceedings.  When the Board of Immigration Appeals can provide a remedy to an alien's claim, "the exhaustion requirement applies with full force."  <u>Sundar</u>, 328 F.3d at 1325.  Perez-Gomez, however, was incorrectly left with the impression that he could not have asked the Board of Immigration Appeals to reconsider his deportation, because the immigration judge's statements eliminated

**34**

any basis on which Perez-Gomez could have filed an appeal. Having been incorrectly informed by the immigration judge's colloquy that he was ineligible for any form of immigration relief, Perez-Gomez was under the mistaken belief that he had no claim.[7] Within his universe of available remedies, there would be no error or denial of discretionary relief on which he could base an appeal for reconsideration to the reviewing administrative agency. Indeed, requiring Perez-Gomez to pursue an appeal in this context--where he believed he had no chance for relief--would directly undermine

---

7. As cited above, the group colloquy on relief by the immigration judge began as follows: "[I]f the court finds that you are subject to removal we will determine whether or not you are eligible for any sort of relief. That relief might allow you to remain in the United States. If any such relief is available, we will discuss it and I will give you an opportunity to apply for it." Transcript of Imm. Hearing, Def.'s Ex. 5 (Doc. No. 47-1) at 2 (repetitions by Spanish interpreter omitted).

Once the immigration judge reached Perez-Gomez individually, he asked him four questions, presumably to determine his eligibility for various forms of relief, and Perez-Gomez responded negatively to each question. Id. at 26-27. The court then ordered him removed. Id. at 27.

judicial efficiency interests, as it would encourage the filing of meritless petitions that petitioners themselves have reasonable cause to believe are baseless.

Finally, unlike a habeas petitioner, an alien challenging his deportation under § 1326 is not back in court voluntarily.  The alien did not decide to bring his case to federal court; that decision was made by the United States in its decision to prosecute him. Moreover, illegal-reentry prosecution ordinarily occurs after any opportunity for administrative exhaustion has passed.   Therefore,  judicial-efficiency  concerns regarding clogging the courts or short-circuiting administrative processes that motivated the Eleventh Circuit in <u>Sundar</u> simply do not apply here.[8]

---

8. Moreover, Perez-Gomez is not seeking a "futility exception," as suggested by the magistrate judge and the government. <u>Sundar</u> explains that petitioners may not seek an exception to administrative exhaustion due to its perceived "futility." There, the court held that a petitioner subject to an administrative-exhaustion requirement for habeas-corpus review of final order "may not bypass the Board simply because he thinks it (continued...)

Therefore, this court will not apply an administrative-exhaustion requirement to Perez-Gomez's case when to do so would violate the constitutional holding of <u>Mendoza-Lopez</u>: "Depriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum,

---

will be unsympathetic to his claim, because the Board of Immigration Appeals may decide, upon reflection, that the contention is valid." <u>Sundar v. INS</u>, 328 F.3d 1320, 1325 (11th Cir. 2003). <u>See also</u> <u>Booth v. Churner</u>, 532 U.S. 731, 741 n.6 (2001) (refusing to make a futility exception to the administrative-exhaustion requirement of the Prison Litigation Reform Act); <u>Engle v. Isaac</u>, 456 U.S. 107, 130 (1982) (same for habeas-corpus review of state criminal convictions under 28 U.S.C. § 2254).

Perez-Gomez does not make a futility argument. He was made to believe that he was categorically ineligible for any form of immigration relief. He had no argument to raise for reconsideration in the first place, regardless of his perception of the sympathies of the forum. A mistaken belief that no relief exists is not a conscious decision to forgo an appeal because of its perceived futility. This is like the difference between failing to file a claim under a belief that the court might not be persuaded by the argument, and failing to file a claim under a belief that a court does not have jurisdiction to entertain it. While courts may have reason to dissuade futile filings, they certainly do not have reason to perpetuate misconceptions regarding the power of the courts.

that review be made available in any subsequent
proceeding in which the result of the deportation
proceeding is used to establish an element of a
criminal offense." Mendoza-Lopez, 481 U.S. at 839.   In
other words, when procedural defects in a deportation
proceeding deprive an alien of judicial review and
result in a fundamentally unfair deportation order--the
second and third prong of § 1326(d)--it would violate
the Constitution to reject the challenge on the basis
that the alien did not exhaust administrative remedies
that were effectively unavailable.

The government attempts to square this circle by
arguing that the constitutional cases decided before
§ 1326(d) was added to the illegal-reentry statute were
somehow abrogated by that provision.   That position
makes no sense.   The Mendoza-Lopez Court held that
collateral attack was required based on the due-process
rights of criminal defendants.   Congress cannot
abrogate a constitutional holding through legislation.

Therefore, the court will interpret the statute consistently with the constitutional holding of Mendoza-Lopez. "The doctrine of constitutional avoidance directs that 'when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail.'" Brown v. United States, 748 F.3d 1045, 1068 (11th Cir. 2014) (quoting Clark v. Martinez, 543 U.S. 371, 380-81 (2005)). The Second Circuit Court of Appeals has found that a consistent interpretation is possible, and this court finds their reasoning to be persuasive. See United States v. Sosa, 387 F.3d 131, 136 (2d Cir. 2004)[9] ("Because Section 1326(d) was intended as a response to, and codification of, Mendoza-Lopez, its

---

9. It worth noting here that the author of Sosa, Judge Ralph K. Winter, was also the author of the only reported Eleventh Circuit case interpreting § 1326(d), Zelaya, 293 F.3d 1294, which he wrote while sitting by designation.

administrative exhaustion requirement must be subject to at least one significant exception to render it consistent with that decision.").[10]

At the very least, when an uncounseled alien forgoes his administrative remedies through a waiver that was not knowing and intelligent, including by virtue of his lack of understanding that there was relief for which he was eligible, those administrative remedies cannot be interpreted as having been "available" to him. See Sosa, 387 F.3d at 136 ("A failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1), therefore, only where the alien's

_____

10. The Ninth Circuit Court of Appeals has developed a more extensive set of circumstances in which it will "excuse" the administrative-exhaustion requirement, and Perez-Gomez argues for the application of those exceptions here. See United States v. Gonzalez-Villalobos, 724 F.3d 1125, 1130–31 (9th Cir. 2013) (describing three categories of cases in which the administrative-exhaustion requirement is excused). However, the Ninth Circuit's approach relies on an extensive body of case law surrounding the due-process rights of aliens in removal proceedings which differ from Eleventh Circuit approaches. Therefore, the court does not adopt the Ninth Circuit's approach.

waiver of administrative review was knowing and intelligent.").

Perez-Gomez waived administrative review of his removal order, but he did so having been misled, by the immigration judge, into believing that there was no basis for an appeal.  To be consistent with the holding of <u>Mendoza-Lopez</u>, Perez-Gomez's challenge cannot fail on the basis of his failure to exhaust administrative remedies that were not functionally available.[11]

-------------------

11. Procedural defects such as these are exacerbated by a situation, such as this one, in which the alien is uncounseled. An uncounseled alien is not likely to have independent access to legal advice, and the representations of the immigration judge define his universe of available legal remedies. <u>See generally</u> <u>United States v. Copeland</u>, 376 F.3d 61, 71 (2d Cir. 2004) (explaining that "a ruling by an [immigration judge] that misleads an alien into believing that no relief exists falls into a different category [from non-fundamental errors] because of the special duties of an [immigration judge] to aliens. The [immigration judge], unlike an Article III judge, is not merely the factfinder and adjudicator but also has an obligation to establish the record.") (internal citations omitted).

By contrast, because a counseled alien may turn to his attorney for support in interpreting and deciding his legal strategy, the Eleventh Circuit has often (continued...)

## 2. Improper Deprivation of Opportunity for Judicial Review

The second requirement of § 1326(d) is that "the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review." 8 U.S.C. § 1326(d)(2). Perez-Gomez's hearing improperly denied him both the right to judicial review and the basis for review by misrepresenting his eligibility for discretionary relief and soliciting a waiver of appeal that was not knowing and intelligent.

---

cited the assistance of counsel in immigration cases as a presumptive indicator of procedural sufficiency. See, e.g., Hyacinthe v. U.S. Atty. Gen., 215 Fed. Appx. 856, 861 (11th Cir. 2007) (describing how certain "shorthand expressions" used by immigration judges, such as "whether they accept a decision as 'final,'" is presumed to be understood by "aliens represented by attorneys," so that a counseled alien "may effectively waive appeal in response to this simple question"); Rodas-Alfaro v. U.S. Atty. Gen., 372 Fed. Appx. 974, 976 (11th Cir. 2010) (holding that an alien's waiver was "knowing and intelligent because he made the decision after consulting with counsel and affirmed under oath that he understood that he was giving up his right to appeal by accepting voluntary departure").

Perez-Gomez appeared at his removal hearing without the assistance of counsel.   The immigration judge stated at the beginning of his hearing that, "If any such relief is available, we will discuss it and I will give you an opportunity to apply for it."   Hearing Transcript (Doc. No. 47-1) at 2-3.   Then, in his colloquy with another detainee, the immigration judge stated that the ability to fund a trip back to one's home country was "the first thing you need" in order to qualify for voluntary-departure relief.   Id. at 18. Finally, in his colloquy with Perez-Gomez, the immigration judge asked him, "Do you have the money immediately available to depart the United States?," to which Perez-Gomez responded, "No."   Id. at 27.   The immigration judge asked no follow-up questions and made no explicit reference to voluntary departure when speaking with Perez-Gomez.

As discussed above, the immigration judge's answer to the other detainee misstates the law: the ability to fund one's return at the hearing itself is not a

**43**

prerequisite for pre-completion voluntary departure. Furthermore, despite Perez-Gomez's eligibility for pre-completion voluntary departure, the immigration judge did not discuss with him or with the group as a whole the nature of the relief, how to apply for it, or what factors he would consider in deciding whether to grant it. This omission violated immigration regulations as interpreted by the Board of Immigration Appeals. In Re Cordova, 22 I. & N. 966, 971 (BIA 1999) ("In order to insure that [voluntary departure under 8 U.S.C. § 1229c(a)] is used fairly, it is critical that respondents be informed of the requirements for relief, as well as their apparent eligibility, and that they be given the opportunity to apply for such relief in a timely manner."); see 8 C.F.R. 1240.11(a)(2). That the regulations impose this duty to inform has also been recognized by the Eleventh Circuit. See Lewis v. U.S. Atty. Gen., 512 Fed. Appx. 963, 969 (11th Cir. 2013) (explaining that the Board of Immigration Appeals has held that immigration judges have a "duty to inform

aliens of potential forms of relief for which they are apparently eligible," including pre-completion voluntary departure).

Perez-Gomez therefore had even less information about a form of relief for which he was eligible than the similarly uncounseled defendants in Mendoza-Lopez did. In that case, the immigration judge actually discussed the applicable form of relief, suspension of deportation, with the aliens as a group and answered questions about the form of relief. However, the immigration judge mistakenly addressed the wrong alien at one point and failed to continue the colloquy when another alien was clearly confused. The Supreme Court upheld the finding that these deficiencies "fail[ed] to overcome these defendants' lack of understanding about the proceedings" and was therefore inadequate for their waivers of appeal rights to be knowing and intelligent. Mendoza-Lopez, 481 U.S. at 832. If waivers cannot be knowing and intelligent after a hearing that failed to overcome a lack of understanding despite the

immigration judge's efforts, they certainly could not be knowing and intelligent after a hearing in which the immigration judge misrepresents eligibility requirements and utterly fails to discuss the nature the relief in the first place.

The Eleventh Circuit has not addressed waiver of appeal rights in the immigration context in a published decision.[12] However, it has recognized that, under Mendoza-Lopez, a waiver of the right to appeal that is not considered or intelligent amounts to a complete deprivation of judicial review when, in addition to failing to inform an alien of his rights to appeal to federal court, the immigration judge also fails to explain adequately an alien's right to discretionary

_____

12. The Eleventh Circuit has recognized, without deciding the question, that the appellate courts are split as to whether immigration officials must inform aliens in removal proceedings of their right to judicial review in federal court. See United States v. Vasquez-Montalban, 263 Fed. Appx. 822 (11th Cir. 2008) (leaving question open); United States v. Lopez-Solis, 503 Fed. Appx. 942 (11th Cir. 2013) (acknowledging the split and holding that, in ordinary cases, the receipt of a final order will be sufficient to put an alien on notice).

relief and, as a result, the alien does not understand that he is eligible to apply for that relief. Lopez-Solis, 503 Fed. Appx. at 945. In other words, when an alien is not given notice of his right to appeal and he lacks understanding about his eligibility for the sole basis on which he could appeal, that alien has been improperly deprived of his right to judicial review.

When, as here, the immigration judge neglects to discuss discretionary relief with an uncounseled alien who is eligible for it and affirmatively misstates the requirements for the sole basis of relief for which an alien is eligible, this court cannot find that the alien made a knowing and intelligent waiver of his right to seek review in a higher court. See Rodas-Alfaro v. U.S. Atty. Gen., 372 Fed. Appx. 974, 976 (11th Cir. 2010) (analogizing a waiver of appeal in the criminal context to the immigration context, and concluding that to be valid, an alien's waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of

the decision to abandon it"). Because Perez-Gomez had no other basis on which to file an appeal, this court finds that he was improperly deprived of the opportunity for judicial review and that he meets the second prong of § 1326(d).

### 3. Fundamental Unfairness

Finally, Perez-Gomez must show that "the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d)(3). It is here that Perez-Gomez trips up.

Though the statute does not define fundamental unfairness, this court understands the term as used in this statute to mean both a fundamental error in the entire proceeding and prejudice resulting from that error. See, e.g., United States v. Charleswell, 456 F.3d 347, 358 (3rd Cir. 2006) ("[B]oth parties agree that in order to succeed on a collateral challenge, under § 1326(d)(3), an alien must show not only that the underlying proceeding suffered some fundamental defect, but also that the result of the defect was

prejudicial."); <u>United States v. Torres</u>, 383 F.3d 92, 103 n.13 (3rd Cir. 2004) (collecting cases).


### A.

In reaching the conclusion that the error in Perez-Gomez's removal proceeding was not fundamental, the court begins with a number of general observations.

First, "removal hearings are civil proceedings, not criminal; therefore, procedural protections accorded an alien in a removal proceeding are less stringent than those available to a criminal defendant." <u>United States v. Lopez-Ortiz</u>, 313 F.3d 225, 230 (5th Cir. 2002). Regardless, certain procedural protections must be met even in administrative proceedings. The Supreme Court has held that, at a minimum, an alien in removal proceedings must be provided (1) notice of the charges against him; (2) an administrative hearing; and (3) an opportunity to be heard. <u>Kwong Hai Chew v. Colding</u>, 344 U.S. 590, 603 (1953).

Second, the fact that the decision whether an alien should be allowed voluntary withdrawal is discretionary is not dispositive. Take, for example, § 240A(b) of the Immigration and Nationality Act. Under this provision, an immigrant can seek a discretionary cancellation of removal if he has lawfully resided in the United States continuously for a certain number of years. 8 U.S.C. § 1229b. Appellate courts have been divided on whether giving inaccurate information on the ability to seek long-term discretionary relief constitutes a violation of an alien's due process. Compare, e.g., Copeland, 376 F.3d at 70 (holding that failure to inform alien of right to seek discretionary relief can amount to fundamental error) with Lopez-Ortiz, 313 F.3d at 231 (holding opposite). To this court, however, the answer is clear: when an immigration judge gives false information about the crux of a deportation proceeding--that is, whether the person will actually be forced to leave the country or

may be given long-term relief--they have rendered the proceeding fundamentally unfair.[13]

Thus, the facts that removal proceedings are civil in nature and that whether to allow voluntary departure is discretionary are not dispositive.

---

13. The government argues that the Eleventh Circuit Court of Appeals has already foreclosed this argument. In Oguejiofor v. Attorney General, 277 F.3d 1305, 1309 (11th Cir. 2002), the appellate court rejected the argument that aliens had a constitutionally protected right to eligibility for discretionary relief.  Id. at 1309.  That case, however, concerned a matter of entitlement to the right: the application of a legal rule regarding retroactivity that turned out to be erroneous.  See also Guerrero-Bermudez v. U.S. Attorney General, 192 Fed. Appx. 903, 905 (11th Cir. 2006) (holding that an alien's substantive due process claim failed because he has no constitutionally-protected right to discretionary relief or to be eligible for discretionary relief).

Perez-Gomez, in contrast, makes a procedural due process argument.  He challenges the denial of his right to make a knowing and intelligent decision about whether to apply for discretionary relief for which he is apparently eligible. This is not the same as a challenge asserting a right to be eligible for that relief.

B.

The government argues that, even if there was fundamental unfairness in Perez-Gomez's removal proceedings, it did not prejudice him.

"[Prejudice] need not rise to the level of showing that the defendant would not have been deported, but rather that the errors might have affected the outcome of the hearing." United States v. Holland, 876 F.2d 1533, 1536 (11th Cir. 1989). On review of the record, it is clear that Perez-Gomez was eligible for at least pre-completion voluntary departure. He may have also had a persuasive argument for post-completion departure. Indeed, Perez-Gomez has submitted an affidavit that he would have applied for voluntary departure if he had been told that he was eligible and that he would have been able to pay the required bond and travel costs. The decision to grant voluntary departure to someone who is eligible falls within the discretion of the immigration judge. But given the various factors taken into consideration for this

**52**

determination, the court finds that it is reasonably probable that Perez-Gomez would have been granted voluntary departure. See In Re Arguelles-Campos, 22 I. & N. Dec. 811, 817 (BIA 1999) (explaining that factors taken into account in granting voluntary departure include the nature of the removal proceedings and immigration history, additional violations of immigration or criminal laws, and evidence of bad character or undesirability, and that adverse factors can be counterbalanced by long residence here, close family ties in the United States, or humanitarian needs).

The government argues that Perez-Gomez could not have shown prejudice because he could not prove with certainty that he would have received voluntary departure. Since this approach conflicts with the standard for prejudice articulated in Holland, the government introduces language from the subsequent case of United States v. Zelaya, 293 F.3d 1294 (11th Cir. 2002), which seems to support its analysis: "An alien

characterizing a deportation as fundamentally unfair must, at a minimum, demonstrate that the outcome of the deportation proceeding would have been different <u>but for</u> a particular error." <u>Id</u>. at 1298 (emphasis added). On closer examination, it appears that this statement of the prejudice requirement is shorthand for the <u>Holland</u> rule, not an alteration of it.  The <u>Zelaya</u> court cites only to <u>Holland</u> for support of its articulation.  While <u>Holland</u> does use the phrase "would have been different" (noting that the alien "has not alleged how the result would have been any different"), 876 F.2d at 1537, it also explains fundamental unfairness in terms of the "possibility of prejudice," and whether a defect "could have made a difference." <u>Id</u>.  The governing rule was as articulated above: fundamental unfairness requires a showing that specific errors <u>might have affected</u> the outcome of a hearing.

Indeed, a contrary reading, and one that would hold this court to the "but for" language of <u>Zelaya</u>, would mean that a challenge to the denial of discretionary

**54**

relief from deportation on the basis of fundamental unfairness could <u>never</u> succeed.   An immigration judge can always deny relief on discretionary grounds, even when an alien is categorically eligible.   Moreover, federal courts do not have jurisdiction to review denials of discretionary relief such as voluntary departure.   8 U.S.C. § 1252(a)(2)(B)(I); <u>Alvarado v. U.S. Attorney Gen.</u>, 610 F.3d 1311, 1314 (11th Cir. 2010).   Therefore, a petitioner alleging an unconstitutional denial of discretionary relief could never prove <u>with certainty</u> that the outcome of the proceeding would have been different but for a particular error.   In <u>Zelaya</u>, the court of appeals did not need to confront this logic because, given Zelaya's aggravated-felony conviction, Zelaya was not eligible for discretionary relief.   In that case, Zelaya could show neither that the proceeding <u>would</u> have been different but for a particular error, nor that the error <u>might</u> have affected the outcome.

Other courts of appeals that have specified a necessary quantum of proof for evaluating prejudice have appropriately applied a lower "reasonable likelihood" standard. See, e.g., United States v. Calderon-Pena, 339 F.3d 320, 324 (5th Cir. 2003) (requiring that an alien demonstrate a "reasonable likelihood that, but for the errors complained of, he would not have been deported"); see also U.S. v. Aguirre-Tello, 353 F.3d 1199, 1208 (10th Cir. 2004) (collecting cases). This standard allows a court to assess probability without creating a no-win scenario.

Moreover, to the extent that the two cases do conflict, the Holland statement of the law is prior precedent and is therefore the correct standard to apply. United States v. Steele, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc) (explaining that "[u]nder our prior precedent rule, a panel cannot overrule a prior one's holding"). Finally, the government argues that Holland, like Mendoza-Lopez, was superseded by the

addition of subsection (d) to § 1326.  For the reasons discussed previously, that argument must fail.

Thus, the court finds that Perez-Gomez would have established prejudice.


C.

However, while Perez-Gomez was prejudiced by the immigration judge's actions, the judge's action did not render the proceedings fundamentally unfair, such that the prejudicial procedural deficiency is subject to a successful collateral challenge under § 1326.

Admittedly, as explained earlier, in Mendoza-Lopez, the Supreme Court did not provide guidance on how far an immigration judge must deviate from the correct procedures to where it amounts to a fundamental error that deprives an alien of due process, such that the administrative proceeding cannot be used as a predicate for a subsequent criminal prosecution.  However, after noting that the challenge there was collateral, as opposed to direct and relying on a comparison with what

57

it considered "analogous abuses" in criminal
proceedings, the Court emphasized the limited
application of the phrase "fundamental" error," 481 U.
at 839, n.17: "We have previously recognized ... in the
context of criminal proceedings, that some errors
necessarily render a trial fundamentally unfair, <u>Rose
v. Clark</u>, 478 U.S. 570, 577 (1986) (use of coerced
confession, adjudication by biased judge); <u>see also
Rose v. Lundy</u>, 455 U.S. 509, 543-544 (1982) (Stevens,
J., dissenting) (mob violence, knowing use of perjured
testimony). While the procedures required in an
administrative proceeding are less stringent than those
demanded in a criminal trial, analogous abuses could
operate, under some circumstances, to deny effective
judicial review of administrative determinations." <u>Id</u>.
at 839, n.17 (internal quotation marks omitted).

Thus, it is not sufficient that there be error, but
rather the "procedural deficiencies [must be] so core
to the fairness of a proceeding that their deprivation,
if prejudicial, will render the proceeding

fundamentally unfair." United States v. Charleswell, 456 F.3d 347, 360 (3d Cir. 2006); see also id. ("[A]n alien's right to counsel in an immigration hearing before an [immigration judge] is so fundamental to the proceeding's fairness that a denial of that right could rise to the level of fundamental unfairness. ... The ability to build an administrative record before an [immigration judge] during his deportation hearing is likewise so fundamental such that a denial, if prejudicial, may also render the proceeding fundamentally unfair."); id. ("Here, we must conclude that the INS's failure to inform Charleswell of his statutorily prescribed right to seek an appeal of his reinstatement order, combined with the misleading language contained in the reinstatement Notice of Intent form, is a fundamental defect of the nature that, if prejudicial, renders the proceeding fundamentally unfair.").

Following this guidance, this court concludes that the immigration judge's misinforming Perez-Gomez about

59

his eligibility for voluntary departure was not a fundamental error. First, it must be emphasized that the challenge here to the removal proceeding is collateral and not direct. Error that is redressable in a direct appeal is not necessarily redressable in a collateral challenge. The collaterally challenged error must be on a par with fundamental errors in a criminal proceeding, such as use of a forced confession or adjudication by biased judge, or on a par with so-far recognized fundamental errors in immigration proceedings, such as denial of counsel or the ability to build an administrative record or the failure to inform an alien of his right to appeal at all.

Second, to be sure, voluntary departure provides a number of benefits for aliens who receive it: "He or she avoids extended detention pending completion of travel arrangements; is allowed to choose when to depart (subject to certain constraints); and can select the country of destination. And, of great importance, by departing voluntarily the alien facilitates the

possibility of readmission." <u>Dada v. Mukasey</u>, 554 U.S. 1, 11 (2008).  Additionally, aliens receiving voluntary departure will not face prosecution for the felony of illegal reentry should they unlawfully return to the United States.   <u>United States v. Garcia</u>, 2008 WL 3890167, at *8 (E.D.N.Y. 2008) (Ross, J.).

However, these benefits of voluntary departure do not go to the core of the removal proceeding.  First, and most importantly, that Perez-Gomez may have been eligible to depart voluntarily does not alter the core result of the proceeding: that he would have been forced to leave the country.  In this sense, voluntary departure is critically different from § 240A(b) relief, which allows for discretionary cancellation of the removal itself and thus goes to the issue of whether the alien will be forced to leave at all. Section 240A(b) goes to the <u>ultimate</u> question of whether the alien should be required to leave, while voluntary departure goes to the question of the <u>manner</u> in which he should leave.

Second, it appears that Perez-Gomez may have faced the same bar to illegal reentry regardless of whether he was given voluntary departure. Under 8 U.S.C. § 1182(a)(9), an unlawful alien present in the United States for more than one year, who receives voluntary departure, must wait ten years to seek admission to the United States. Likewise, an alien who is deported for the first time faces the same ten-year bar to legal reentry.

Moreover, voluntary departure is merely a beneficial "quid pro quo" between the government and an alien that allows for a more expedited, less expensive, and more convenient deportation process, but requires that the alien leave nonetheless. Dada v. Mukasey, 554 U.S. 1, 11 (2008). In other words, while voluntary departure may be more beneficial for the alien, it does not go to the core issue of the deportation proceeding (whether the alien has to leave) or to the process by which that core issue is determined.

Therefore, while the lack of an opportunity to seek voluntary departure might be redressable on a direct appeal, it is not sufficiently core to the removal proceeding that it should be redressable in a collateral proceeding.

Perez-Gomez also bases his fundamental unfairness argument on being subject to future criminal prosecution for reentry. While the court recognizes the real and severe collateral consequences of deportation, the possibility of heavier penalties in subsequent criminal convictions is not enough, in this case, to establish that the removal proceeding itself was fundamentally unfair. Cf. Spencer v. Kemna, 523 U.S. 1, 15 (1998) (explaining that a claim contingent upon respondents' violating the law, getting caught, and being convicted is not sufficient to establish a constitutional injury for standing purposes); but see Garcia, 2008 WL 3890167, at *8 (finding fundamental error where immigration judge did not correctly inform alien of voluntary departure in part because of

potential   future   prosecution   for   illegal   reentry).
Within the facts of this case, Perez-Gomez cannot base
his   claim   to   fundamental   unfairness   of   the   removal
order       on       his       future       criminal       penalties.

Perez-Gomez further argues that the availability of
voluntary   departure   implicates   his   liberty,   for   he
could have made bond and enjoyed freedom during the 15
days it took to deport him as well as during the time
he   would   have   had   if   he   been   allowed   to   depart
voluntarily.   However,   while   this   is   true,   again   this
does   not   go   to,   or   in   any   way   undermine,   the   core
determination that he had to leave this country.   As
the Third Circuit Court of Appeals has explained: "Some
procedural defects ... are not so fundamental that they
could   render   the   underlying   proceeding   fundamentally
unfair.   For   example,   the   right   to   be   told   of   the
possibility of being free on bond pending appeal, while
a   procedural   defect,   is not fatal to the entire
proceeding."   Charleswell,   456   F.3d   at   360   (emphasis
added).

**64**

\*\*\*

For the above reasons, this court denied Perez-Gomez's motion to dismiss the one-count indictment against him for unlawful reentry.

DONE, this the 26th day of November, 2014.

      /s/ Myron H. Thompson
   UNITED STATES DISTRICT JUDGE